Nicholas W. DEBELLIS, III, et al., Plaintiffs,

v.

Patrol Officer Charles KULP, et al., Defendants.

No. 00–3386.

United States District Court, E.D. Pennsylvania.

Sept. 10, 2001.

John P. Karoly, Allentown, PA, for plaintiffs.

Robert J. Magee, Allentown, PA, for defendants.

## OPINION AND ORDER

VAN ANTWERPEN, District Judge.

### I. INTRODUCTION

Plaintiffs Nicholas W. DeBellis, III and Patricia DeBellis, the parents and natural guardians of Karisa DeBellis ("DeBellis"), have brought the instant action on her behalf pursuant to 42 U.S.C. § 1983. Plaintiffs allege that the Defendants Patrol Officer Charles Kulp ("Kulp"), Patrol Officer Keith Morris ("Morris"), Youth Officer Carol Bennis ("Bennis"), Youth Officer David Moyer ("Moyer"), Captain Carl W. Held, the City of Allentown Department of Police, Mayor William L. Heydt and the City of Allentown violated DeBellis' rights under the Fourth Amendment of the United States Constitution.[1] They have also brought state law claims for assault and battery, false imprisonment, false arrest, intentional infliction of emotional distress and negligent infliction of emotional distress against all of the defendants.

---

1. Plaintiffs have sued Kulp, Morris, Bennis, Moyer, Held and Heydt each in his or her individual and official capacities.

Presently before this Court is Defendants' Motion for Summary Judgment on all claims, filed by the Defendants on July 30, 2001. We have jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1343 and 1367.

## II. *STANDARD OF REVIEW*

The court shall render summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is "material" only if it might affect the outcome of the suit under governing law. *Id.* at 248, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202. All inferences must be drawn, and all doubts resolved, in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Gans v. Mundy*, 762 F.2d 338, 341 (3d Cir.1985), *cert. denied*, 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985).

On motion for summary judgment, the moving party bears the initial burden of identifying those portions of the record that it believes demonstrate the absence of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To defeat summary judgment, the non-moving party must respond with facts of record that contradict the facts identified by the movant and may not rest on mere denials. *Id.* at 321 n. 3, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (quoting Fed.R.Civ.P. 56(e)); *see First Nat'l Bank of Pennsylvania v. Lincoln Nat'l Life Ins. Co.*, 824 F.2d 277, 282 (3d Cir. 1987). The non-moving party must demonstrate the existence of evidence that would support a jury finding in its favor. *See Anderson*, 477 U.S. at 248–49, 106 S.Ct. at 2505.

## III. *FACTUAL BACKGROUND*

The following is a review of the factual background of this case.

### A. *Events Preceding Police Encounter with Karisa DeBellis*

In the early spring or summer of 1998, Allentown Youth Officer Carol Bennis ("Bennis") learned that a juvenile known as K.L. was a chronic runaway, and in early July of 1998, learned that K.L. had again run away from home. (C. Bennis Aff. at ¶¶ 3,5) At around 3:00 p.m. on July 6, 1998, Bennis received a report from one J.B. (whom Bennis knew to be the fiancé of K.L.'s father) that K.L. had been spotted by a relative walking in the 800 block of Gordon Street in Allentown, Pennsylvania. (*Id.* at ¶ 6.) Based on information provided to her prior to July 6, 1998, Bennis believed K.L. to be between 5'4 and 5'7 in height and to weigh a maximum of 145 pounds; Bennis also knew that K.L. had been involved in drug use, and may have lost weight. (*Id.* at ¶ 4.) Bennis had never met K.L.; nor had she seen a photograph of her. (*Id.*) Bennis believed that K.L. posed a flight risk, that K.L. had on at least one prior occasion provided a false name to police and that K.L. had mental health issues. (*Id.* at ¶ 6.)

At approximately 3:00 p.m. (K. DeBellis Dep. at 47), Karisa DeBellis ("DeBellis"), a seventeen-year-old (*Id.* at 7), 5'2 or 5'3 woman weighing approximately 90 pounds (*Id.* at 31–32), had left the home of a friend to go to work at a "Subway" sandwich shop located at 9 American Parkway in Allentown, Pennsylvania. (*Id.* at 42; K.

DeBellis Aff. at ¶ 1.) Taking her normal route, DeBellis walked up 10th Street and cut through a cemetery located at Turner Street. (K. DeBellis Aff. at ¶ 2; K. DeBellis Dep. at 43.)

Upon receiving the report that K.L. had been spotted, Bennis asked fellow youth officer David Moyer ("Moyer") to accompany her, and they proceeded to the general vicinity. (C. Bennis Aff. at ¶ 7; D. Moyer Aff. at ¶¶ 5–6.) Bennis and Moyer observed a young female entering a cemetery approximately three blocks from the area where K.L. was reportedly seen. (C. Bennis Aff. at ¶ 8; D. Moyer Aff. at ¶ 6.) According to Bennis, she had no doubt that the woman was K.L. (C. Bennis Aff. at ¶ 10). Although Moyer had no prior involvement with K.L. and had never met her or seen a photograph of her, given Bennis' positive identification of DeBellis as K.L., he exited the vehicle, in an effort to take her into custody. (C. Bennis Aff. at ¶ 11; D. Moyer Aff. at ¶ 10.) A call was placed on the police radio for assistance in apprehending the juvenile; Bennis then drove to the south side of the cemetery in the event that the juvenile fled in that direction. (C. Bennis Aff. at ¶ 12).

According to DeBellis, when she was several yards into the cemetery, a man dressed in a jacket and a tie[2] approached her, yelling for her to wait. (K. DeBellis Aff. at ¶ 4; K. DeBellis Dep. at 45–47.) This man turned out to be Officer Moyer.

### B. *Police Encounter with Karisa De-Bellis*

#### 1. *Plaintiffs' Version*

DeBellis waited for Moyer to reach her, at which time he asked DeBellis what her name was and if she had any identification.

(K. DeBellis Aff. at ¶ 5; K. DeBellis Dep. at 47, 58.) She replied "Karisa DeBellis" and stated that she did not have any identification. (K. DeBellis Aff. at ¶ 6; K. DeBellis Dep. at 47.) DeBellis alleges that Moyer then grabbed her arm and, at the same time, flashed something resembling a calculator case; DeBellis did not at that time know what the object was. (K. DeBellis Aff. at ¶ 8; K. DeBellis Dep. at 47–49.) Fearing that he was going to try to rape her, DeBellis tried to pull away from him, at which point Moyer held her more forcefully and attempted to drag her towards Turner Street. (K. DeBellis Aff. at ¶¶ 9–11; K. DeBellis Dep. at 50–51.) DeBellis repeatedly screamed for him to get away from her. (K. DeBellis Dep. at 50, 52, 60.) In an effort to free herself, DeBellis grabbed onto a tombstone with her left hand. (K. DeBellis Aff. at ¶ 13; K. DeBellis Dep. at 51–54.) According to DeBellis, Moyer pulled her body so hard that she lost her grip on the tombstone. (K. DeBellis Aff. at ¶ 14; K. DeBellis Dep. at 54.) He then kicked her feet out from underneath her, such that she spun in a 180 degree turn and landed hard on her back. (K. DeBellis Aff. at ¶¶ 14–15; K. DeBellis Dep. at 54–56.) He then straddled her, holding her hands above her head and pinning her legs to the ground so that all DeBellis could move was her head. (K. DeBellis Dep. at 56–57.) Still believing that she was going to be raped, DeBellis continued to scream for help. (K. DeBellis Aff. at ¶ 17; K. DeBellis Dep. at 60.)

According to DeBellis, while she was still pinned on the ground, a woman (later identified as Bennis) and two uniformed officers (later identified as Patrol Officer Keith Morris ("Morris") and Patrol Officer Charles Kulp ("Kulp"))—one on a bike

---

**2.** It appears that it was customary for Youth Officers Bennis and Moyer not to wear police uniforms.

(Kulp)—arrived. (K. DeBellis Aff. at ¶ 18; K. DeBellis Dep. at 60–62.) DeBellis asserts that someone removed her back pack from her back and that Morris handcuffed her hands behind her back. (K. DeBellis Aff. at ¶ 21; K. DeBellis Dep. at 63, 69.) Throughout the encounter, Bennis repeatedly referred to DeBellis as "Cassandra." (K. DeBellis Aff. at ¶¶ 22–23; K. DeBellis Dep. at 64.) DeBellis protested that she was not "Cassandra." (K. DeBellis Aff. at ¶ 22; K. DeBellis Dep. at 64.) DeBellis did not have any identification with her, but provided her date of birth and her mother's and father's names in order to prove her identity. (K. DeBellis Aff. at ¶ 24; K. DeBellis Dep. at 64–66.) She also requested that the officers check her bag to see that her Subway uniform was inside and to call her father, the Subway manager. (K. DeBellis Aff. at ¶ 25; K. DeBellis Dep. at 66.) Bennis opened the back pack and removed DeBellis' uniform. (K. DeBellis Aff. at ¶ 26; K. DeBellis Dep. at 66.) The officers did not call her father, but instead pulled her to her feet and transported her to the police station. (K. DeBellis Aff. at ¶ 27; K. DeBellis Dep. at 66–70.) DeBellis was crying and insisting that her name was not Cassandra. (K. DeBellis Aff. at ¶ 27.) At no point did the officers tell her that she was under arrest or that she was suspected of being a runaway or of having committed a crime. (K. DeBellis Aff. at ¶ 58.)

Once at the station, the officers shackled her to the floor in front of Bennis' desk. (K. DeBellis Aff. at ¶ 31; K. DeBellis Dep. at 72.) Bennis called K.L.'s father, and then called DeBellis' father (K. DeBellis Aff. at ¶¶ 35, 43–44; K. DeBellis Dep. at 73–74), at which point Bennis told someone in the next room that they had the wrong person. (K. DeBellis Aff. at ¶ 46.) The police then drove DeBellis to the Subway shop. (K. DeBellis Aff. at ¶ 49; K. DeBellis Dep. at 75.) DeBellis alleges that she was cut and bruised (K. DeBellis Dep. at 72–73, 78, 80–81) and that upon seeing her bruises, her father suggested that she go to the hospital for an examination. (K. DeBellis Aff. at ¶ 52.) DeBellis went to St. Luke's Emergency Room. (K. DeBellis Aff. at ¶ 54; K. DeBellis Dep. at 86.) Since the incident, DeBellis has had several sessions of physical therapy to treat her injuries and has seen psychological professionals to treat the psychological trauma she has since experienced. (K. DeBellis Aff. at ¶¶ 56–57; K. DeBellis Dep. at 18, 21–22, 91, 103–04.)

### 2. *Defendants' Version*

Defendants, on the other hand, state that Moyer displayed his badge upon approaching DeBellis-even before asking DeBellis her name. (D. Moyer Aff. at ¶¶ 8–9.) Defendants also claim that at that point Moyer also verbally identified himself as a police officer (*Id.* at ¶ 8); DeBellis, on the other hand, denies that Moyer verbally identified himself as a police officer. (K. DeBellis Dep. at 59.) Although Moyer admits that DeBellis responded with a name that differed from the runaway juvenile's name, Moyer nonetheless believed that he should attempt to take DeBellis into custody, given Bennis' identification of her as the runaway juvenile. (D. Moyer Aff. at ¶¶ 9–10.) Moyer was also aware that the runaway juvenile was inclined to flee and had previously used false names. (*Id.* at ¶ 7.) Moyer contends that when he attempted to apprehend her, DeBellis, struggling in what appeared to be an attempt to escape, tried to avoid Moyer's grasp and to kick Moyer. (*Id.* at ¶¶ 11–12.) Moyer states that he was eventually able to pull DeBellis off balance, at which point she fell to the ground. (*Id.* at ¶ 13.)

At this point, Officers Bennis, Kulp and Morris arrived. (C. Bennis Aff. at ¶ 13; C. Kulp Aff. at ¶ 4; K. Morris Aff. at ¶ 5.)

Defendants admit that DeBellis protested that she was not K.L. (C. Bennis Aff. at ¶ 14; D. Moyer Aff. at ¶ 9.) Nonetheless, Bennis did not doubt that the individual apprehended was K.L; given her belief that the juvenile was lying about her identity and given DeBellis' failure to produce any identification, Bennis believed she had to take her to police headquarters. (C. Bennis Aff. at ¶ 14.) Standard operating procedure and departmental regulations and/or policy required that she be handcuffed and that, once at headquarters, that she be restrained, which was accomplished by shackling her leg to the floor. (*Id.* at ¶¶ 17–18; D. Moyer Aff. at ¶¶ 16–17.) After calling DeBellis' father, Bennis realized that they had the wrong individual, at which point DeBellis was released. (C. Bennis Aff. at ¶¶ 19–20.)

## IV. *DISCUSSION*

### A. *Claims Under 42 U.S.C. § 1983*

#### 1. *42 U.S.C. § 1983: Background*

■ 42 U.S.C. § 1983 imposes civil liability upon any person who, acting under the color of state law, deprives another individual of any rights, privileges, or immunities secured by the Constitution or laws of the United States. Section 1983 does not create any new substantive rights, but instead provides a remedy for the violation of a federal constitutional or statutory right. *Baker v. McCollan* 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979); *Gruenke v. Seip,* 225 F.3d 290, 298 (3d Cir.2000). To state a claim under Section 1983, a plaintiff must show that the defendant, through conduct sanctioned under the color of state law, deprived her of a federal constitutional or statutory right. *Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.E.2d 420 (1986); *Gruenke,* 225 F.3d at 298.

In Count VI, plaintiffs allege violations of the Fourth Amendment to the United States Constitution as the bases for their Section 1983 claim. Plaintiffs contend that defendants violated DeBellis' constitutional rights by arresting her without probable cause and by using excessive force in effectuating her arrest. With respect to plaintiffs' Section 1983 claims, defendants' brief in support of their motion for summary judgment contends in substance that (1) the officers are entitled to qualified immunity on the grounds that they took DeBellis into custody upon a reasonable mistake and (2) the excessive force claim should be dismissed because the evidence establishes that the officers used only the force that was necessary to apprehend the suspect. Each of these arguments is discussed in turn.

#### 2. *42 U.S.C. § 1983: Liability of Allentown Police Department*

■ First, we dispose of some matters of pleading. In Section 1983 actions, police departments cannot be sued in conjunction with municipalities, because the police department is merely an administrative arm of the local municipality, and is not a separate judicial entity. *See, e.g., Dean v. Barber,* 951 F.2d 1210, 1215 (11th Cir.1992); *Rhodes v. McDannel,* 945 F.2d 117, 120 (6th Cir.1991), *cert. denied,* 502 U.S. 1032, 112 S.Ct. 872, 116 L.Ed.2d 777 (1992); *Open Inns, Ltd. v. Chester County Sheriff's Dept.,* 24 F.Supp.2d 410, 417 (E.D.Pa.1998); *Irvin v. Borough of Darby,* 937 F.Supp. 446, 451 (E.D.Pa.1996); *Regalbuto v. City of Philadelphia,* 937 F.Supp. 374, 377 (E.D.Pa.1995). Because Allentown Police Department is merely an arm of the city of Allentown, we will grant summary judgment to the Police Department on the Section 1983 claim.

#### 3. *42 U.S.C. § 1983: Liability of Officers Bennis, Kulp, Morris and Moyer, Captain Held and Mayor Heydt, as Sued in their Official Capacity*

■ The face of plaintiffs' complaint states that plaintiffs are suing Officers

Bennis, Kulp, Morris, and Moyer, Captain Held and Mayor Heydt in both their official and individual capacities. The Supreme Court has stated that a suit under Section 1983 against a municipal officer in his or her official capacity is, in actuality, a suit against the municipality that the officer represents; an official capacity suit is essentially treated as a suit against the entity itself. *Kentucky v. Graham*, 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). *See also Busby v. City of Orlando*, 931 F.2d 764 (11th Cir.1991); *Ruiz v. Philadelphia Hous. Auth.*, No. CIV.A. 96–7853, 1998 WL 159038, at *6 (E.D.Pa. March 17, 1998); *Verde v. City of Philadelphia*, 862 F.Supp. 1329, 1336–37 (E.D.Pa.1994); *Agresta v. City of Philadelphia*, 694 F.Supp. 117, 119 (E.D.Pa.1988); *Baldi v. City of Philadelphia*, 609 F.Supp. 162, 168 (E.D.Pa.1985). Accordingly, we will grant summary judgment to Defendants Bennis, Kulp, Morris, Moyer, Held and Heydt on the Section 1983 claim brought against each of them in his or her official capacity.[3] The remainder of the § 1983 discussion considers the claims brought against the defendants in their individual capacities.

**3.** We note that the portion of plaintiffs' suit that seeks damages from Bennis, Kulp, Morris, Moyer, Held and Heydt in their individual capacities is properly pled and, at least as a matter of pleading, survives.

**4.** Actions by an officer in his or her official capacity are under color of law even if they are not in furtherance of state policy and even if they violate state law. *See Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).

**5.** A seizure triggering the Fourth Amendment's protections occurs when government actors have, "by means of physical force or show of authority, . . . in some way restrained the liberty of a citizen." *Terry v. Ohio*, 392 U.S. 1, 19, n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

4. *42 U.S.C. § 1983: Liability of Officers Bennis, Kulp, Morris and Moyer, Captain Held and Mayor Heydt, as Sued in their Individual Capacity*

 It is clear that the officers were acting under the color of law when they encountered DeBellis. Officers Bennis and Moyer were acting in their official capacity when they set out to locate the suspected runaway, and Officers Kulp and Morris were acting in their official capacity when they responded to the call for assistance.[4] Nor is there any doubt that De-Bellis was seized. Indeed, she was brought to the ground by a police officer, handcuffed, transported to the police station in a police vehicle and shackled to the floor at the police station.[5]

a. *Mistaken Identity Claim*

However, the parties dispute whether defendants had probable cause to arrest her. Plaintiffs allege that defendants lacked probable cause to arrest DeBellis.[6] Defendants claim that they had grounds to take an individual (K.L.) into custody, but, through a reasonable mistake, took the wrong individual (DeBellis) into custody, and are entitled to qualified immunity.[7]

**6.** For example, plaintiffs allege that defendants violated her Fourth Amendment rights in unlawfully taking DeBellis into custody. (Pls.' Compl. at ¶ 96.)'

**7.** As noted above, in addition to alleging that the officers lacked probable cause, plaintiffs also assert the use of excessive force as another basis for a violation of the Fourth Amendment. Defendants, however, have not argued in their Brief in Support of Their Motion for Summary Judgment that they are entitled to qualified immunity on the grounds that the force that they used was reasonable. Accordingly, when discussing qualified immunity, we address only the lack of probable cause basis.

i. *42 U.S.C. § 1983: Qualified Immunity: Analytical Framework*

■ Whether defendants are entitled to qualified immunity is an issue appropriate for resolution on summary judgment. Indeed, the availability of qualified immunity as a defense is a question of law. *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991). The Court has repeatedly emphasized the importance of resolving immunity questions at the earliest possible state in litigation because "[t]he entitlement is an immunity from suit rather than a mere defense to liability." *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)).

■ Qualified immunity shields state officials performing discretionary functions from suit for damages if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Wilson v. Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). The United States Supreme Court recently reiterated the importance of considering, in a suit against an officer for an alleged violation of a constitutional right, the requisites of a qualified immunity defense in proper sequence. *Saucier v. Katz,* — U.S. —, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).[8] The threshold question is whether, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Id.,* 121 S.Ct. at 2156. If no constitutional right would have been violated were the allegations established, the inquiry ends; there is no need for further inquiry concerning qualified immunity. *Id.* If, on the other hand, a violation could be established, the next step is to ask whether the right was clearly established. *Id.* The Court has stressed that in order for the right to be relevant to the case under consideration, the right the official is alleged to have violated must be clearly established in a particularized sense; that is, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). It is only when the right allegedly violated is defined with appropriate specificity that a court can determine if it was in fact clearly established. *Saucier,* 121 S.Ct. at 2156 (citing *Wilson v. Layne,* 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). The dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *Id.* If a reasonable officer would have known that his or her conduct violated the right, then the defendant-officer is not entitled to qualified immunity for his or her actions. *See Harlow,* 457 U.S. at 813–20, 102 S.Ct. 2727; *Bartholomew v. Commonwealth of Pennsylvania,* 221 F.3d 425, 428 (3d Cir. 2000).

**8.** *Saucier* considered the principles underlying the qualified immunity defense in a *Bivens*-type action. The principles articulated in *Saucier* are applicable in Section 1983 cases, and thus in the instant case, since the qualified immunity analysis is identical under Section 1983 and under *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). *Wilson v. Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999); *Jorden v. Nat'l Guard Bureau,* 799 F.2d 99, 105–06 (3d Cir.1986); *Lattany v. Four Unknown U.S. Marshals,* 845 F.Supp. 262, 265 (E.D.Pa.1994).

ii. *42 U.S.C. § 1983: Defendants' Claim of Qualified Immunity: Analysis*

We consider at the outset of our qualified immunity analysis what level of cause law enforcement officers in defendants' position must possess in order to take lawfully a suspected runaway into custody. Pennsylvania law provides that "[a] child may be taken into custody: ... [b]y a law enforcement officer or duly authorized officer of the court if there are *reasonable grounds* to believe that the child has run away from his parents, guardian, or other custodian." 42 Pa. Cons.Stat. § 6324(4) (West 2000) (emphasis added).[9] Although the parties have cast their arguments in terms of whether the officers had probable cause to take the juvenile into custody, the language of § 6324(4) prompts us to consider whether probable cause is indeed required, or whether some lower standard of cause, such as reasonable suspicion, applies.

Our inquiry has revealed no Pennsylvania or Third Circuit cases addressing the meaning of § 6324's "reasonable grounds" language. Numerous states have statutes with language identical to that found in § 6324(4), allowing law enforcement officers to take children into custody upon "reasonable grounds" to believe that they have run away. *See e.g.*, Ala.Code § 12–15–56 (2001); Ariz.Rev.Stat. § 8–303 (2001); Colo.Rev.Stat. Ann. § 19–3–401 (2001); D.C.Code Ann. § 16–2309 (2000); Fl.Stat.Ann. § 39.401 (2001); Ga.Code § 15–11–45 (2001); Iowa Code Ann. § 232.19 (2001); Neb.Rev.Stat. § 43–248 (2001); N.H.Rev.Stat. § 169–D:8 (2001); N.J.Rev.Stat.Ann. § 2A:4A–20 (2001); N.D.Cent.Code § 27–20–13 (2001); Ohio Rev.Code Ann. § 2151.31 (2001); S.D. Codified Laws § 26–7A–12 (2001); Tenn. Code Ann. § 37–1–113 (2001); Utah Code Ann. § 78–3a–113 (2001); Wyo.Stat. § 14–6–405 (2001) (repealed, effective July 1, 2003).[10]

Our review of case law interpreting parallel language in other state statutes suggests that in this context, "reasonable grounds" means "probable cause." In *Del Valle v. Taylor*, 587 F.Supp. 514 (D.N.D. 1984), the court considered whether a juvenile supervisor was entitled to absolute immunity from civil liability for his determination that reasonable grounds existed to take a child into custody pursuant to state law providing that a supervisor shall taken into custody and detain a child who is delinquent, unruly or depraved.[11] The court held that

> when a juvenile supervisor must determine whether reasonable grounds exist to take a child into custody, pursuant to section 27–20–13 of the North Dakota Century Code [a statute paralleling Pennsylvania's § 6324], the juvenile supervisor is performing a traditionally judicial function. *The determination by*

9. § 6324 also allows an officer to take a child into custody on additional grounds: pursuant to the laws of arrest; when there are reasonable grounds to believe that the child is suffering from illness or injury or is in imminent danger from his surroundings; and when there are reasonable grounds to believe that the child has violated conditions of his probation.

10. The majority of these statutes also allows a law enforcement officer to take a juvenile into custody on additional grounds, such as when there are reasonable grounds to believe that the child is being abused or when there is cause to believe that the child has committed a crime.

11. The court stated only that the officers decided to take the child into custody based upon conversations with the child's mother, and does not specify the precise reasons for apprehending the child. Thus, we note that *Del Valle* does not necessarily involve the taking into custody of a runaway.

*the juvenile supervisor pursuant to section 27–20–13 is similar to the judicial determination of whether probable cause to arrest exists.* It is distinguished from an arrest by a police officer, who must seek a judicial determination as to whether probable cause to arrest exists either prior to, or, without unnecessary delay, after the arrest.

*Id.,* 587 F.Supp. at 517 (emphasis added).

In *In the Matter of Mark A.,* 145 Misc.2d 955, 549 N.Y.S.2d 325 (N.Y.Fam. Ct.1989), the Court analyzed the conduct of an officer who approached a juvenile, believing that he was a runaway, and who thereafter discovered the individual to be in illegal possession of a weapon. The court interpreted a New York statute authorizing a police officer to return to parents a child he or she reasonably believes to be a runaway.[12] The court concluded that the officer's reasonable opinion should be supported by probable cause to believe that the child has runaway, *id.,* 154 Misc.2d at 957, 549 N.Y.S.2d at 327, and applied this probable cause standard to the facts of the case.

■ Based on our analysis of § 6324(4), parallel statutes from other jurisdictions and case law interpreting those statutes, we conclude that § 6324(4) requires that an officer have probable cause to believe that a juvenile has run away before taking that juvenile into custody.[13]

Accordingly, the first question in our qualified immunity analysis is whether the facts alleged, taken in the light most favorable to plaintiff, show that the officers apprehended DeBellis without probable cause to believe that she was the runaway for whom they were searching. If, according to the facts alleged, probable cause to take DeBellis into custody could not be found to be lacking, then plaintiffs have not shown a violation of DeBellis' constitutional rights under the Fourth Amendment, and the qualified immunity inquiry as to plaintiffs' mistaken identity claim ends.

Although probable cause to arrest, and, analogously, to take a runaway into custody, does not require that the officer have evidence sufficient to prove guilt beyond a reasonable doubt, it does require more than mere suspicion. "[P]robable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been committed [or that a person is a suspected runaway] or is being committed by the person to be ar-

---

**12.** New York's legislature has specified conduct that would lead an officer the reasonable conclusion that a particular juvenile had run away from home. Family Court Act § 718 provides in part that

a police officer or peace officer may reasonably conclude that a child has run away from home when the child refuses to give his name or the name and address of his parent or other person legally responsible for his care or when the officer has reason to doubt that the name or address given are the actual name and address of the parent or other person legally responsible for the child's care.

**13.** This requirement that probable cause exist in order to take a suspected runaway juvenile into custody is linked to the Fourth Amendment's requirement that arrests be reasonable and, accordingly, based on probable cause. *See, e.g., Cooley v. Stone,* 414 F.2d 1213 (D.C.Cir.1969) (holding that juvenile, taken into custody and detained pending trial, was entitled to protections of Fourth Amendment and, thus, to probable cause hearing) (relying on *In re Gault,* 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967) and *Kent v. United States,* 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966)). Therefore, cases interpreting the Fourth Amendment's probable cause requirement guide us.

rested." *Orsatti v. New Jersey State Police,* 71 F.3d 480, 482–83 (3d Cir.1995).

■ Here, it is undisputed that the officers had only a general description of the runaway K.L. which included her approximate weight and height and that the arresting officers had never encountered K.L. or seen a photograph of her. It is agreed that upon being approached by Moyer, DeBellis stated her own name and, thus, one that differed from the runaway's. Both parties agree that DeBellis thereafter denied being "K.L." or "Cassandra." Plaintiffs also allege that DeBellis provided her date of birth and her mother's and father's names. Plaintiffs also assert that although DeBellis did not have any identification with her, DeBellis informed the officers that she was on her way to work at Subway and that they could confirm this by looking in her back pack where her Subway uniform was located and by telephoning her father, the Subway manager. According to DeBellis, Bennis did open her back pack and saw her Subway uniform. The parties agree that the officers did not call her father immediately, but instead took DeBellis to the police station. The parties agree that it was after the officers took DeBellis to the police station and called the runaway's father and then DeBellis's father that DeBellis was released.

Viewing the facts in the light most favorable to plaintiffs and accepting as true plaintiff's allegations, we conclude that plaintiffs have failed to show that the officers apprehended DeBellis without probable cause. It is undisputed that the officers had only a bare description of the runaway. They knew only that K.L. was between 5'4 and 5'7 in height and weighed a maximum of 145 pounds (but may have recently lost a great deal of weight). Had the officers acted on this general description alone, we might conclude that the officers acted without probable cause.

However, arresting officers are entitled to take into account such factors as the geographic proximity between where the suspect is seen and where the individual is apprehended and the closeness in time between the reported crime or siting of the individual and their apprehension of the suspect. *See, e.g., United States v. Jimenez,* 780 F.2d 975, 978 (11th Cir. 1986) ("A person of reasonable caution is not prohibited ... from taking into account such factors as geographic location or known modus operandi in formulating his belief as to the occurrence of a crime."); *People v. Williamson,* 319 Ill. App.3d 891, 747 N.E.2d 26, 254 Ill.Dec. 269 (2001) ("In determining probable cause, police may consider as relevant the closeness in geographic location between crime and arrest."). Here, DeBellis' apprehension was supported by other relevant facts and circumstances known to the arresting officers. DeBellis was spotted in close proximity to the area where K.L. was reportedly seen, within a very short time after the report. Indeed, the officers observed DeBellis three blocks from the area where K.L. was seen just fifteen minutes after the report was made.

Plaintiffs argue not only that the officers had only a general description, but also that DeBellis did not match even the limited description of the reported runaway because at the time, DeBellis was 5'2 or 5'3 in height and weighed approximately 90 pounds. Nevertheless, we find that the discrepancies between the description of K.L. and the appearance of DeBellis do not establish that the officers lacked probable cause to apprehend DeBellis. Indeed, DeBellis' actual height matched the low-end of the height description. Moreover, the officers believed that K.L. may have recently lost a great deal of weight; thus, we cannot say that their apprehending an individual who weighed significantly less

than the maximum weight given in the description of K.L. was unreasonable.

Additionally, the fact that DeBellis gave a name that differed from that of the runaway and provided her address, her parents' names and her place of work does not conclusively establish that the officers lacked probable cause in apprehending her. Indeed, Officers Bennis and Moyer knew that the suspected runaway had provided false names in the past. Nor does DeBellis' attempting to escape from Moyer establish that the officers lacked probable cause; the officers also knew that K.L. posed a flight risk and had mental health issues.

Because plaintiff's allegations, even if true, and the facts, even when viewed in the light most favorable to the plaintiff, do not show that the officers apprehended DeBellis without probable cause, plaintiffs have failed to establish that DeBellis' Fourth Amendment rights were violated when the officers mistakenly identified her as the runaway.

This Court's determination that plaintiffs's allegations fail to establish a constitutional violation renders any additional discussion of the officers' qualified immunity unnecessary. Nevertheless, the Court deems it appropriate to address the issue of the reasonableness of the officers' belief in the alternative, assuming arguendo that defendants' mistaken identity might be viewed as supporting a claim for a violation of the Fourth Amendment. The next inquiry in the qualified immunity analysis is whether the right allegedly infringed was clearly established at the time of the encounter. It is clear that at the time of DeBellis' apprehension, an arrest could be made only with probable cause. *See generally Berg v. County of Allegheny*, 219 F.3d 261, 272 (3d Cir.2000). However, as the United States Supreme Court has recently indicated, the *specific* violation at issue must have been clearly established such that a reasonable officer would know that his or her particular conduct that is the basis for the claimant's challenge violated the United States Constitution. Here, then, the question is whether at the time of DeBellis' apprehension it was clearly established that an officer, possessed with a description of a suspected runaway's height and weight only, but making an arrest closely proximate in geography and time to a reported siting of the runaway, violates the constitutional rights of an individual when the officer mistakenly takes that individual into custody.

Admittedly, no case mirrors facts this detailed. Nonetheless, the United States Supreme Court has, in *Hill v. California*, 401 U.S. 797, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971), addressed the issue of mistaken identity. In *Hill*, officers mistakenly arrested an individual named Miller, rather than the suspect, Hill, at an apartment they believed to be occupied by Hill and subsequently conducted a warrantless search of the apartment and seized incriminating evidence. The Court held that although the arrestee's appearance differed in some respects from the description of the suspect and although Miller denied being Hill, the officers had probable cause to arrest Hill, reasonably believed that Miller was in fact Hill and thus "were entitled to do what the law would have allowed them to do if Miller had in fact been Hill ..." *Id.*, 401 U.S. at 804, 91 S.Ct. 1106, 28 L.Ed.2d 484. The Court reasoned that "[w]hen judged in accordance with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act, the arrest and subsequent search were reasonable and valid under the Fourth Amendment." *Id.*, 401 U.S. at 804–805, 91 S.Ct.

at 1106 (internal quotes and citations omitted).

▮ *Hill* argues against the proposition that there was case law clearly establishing that defendants' conduct, in mistakenly identifying and apprehending DeBellis, violates the Constitution; rather, it suggests that officers in defendants' position, acting on a general description and arresting an individual within close geographic and temporal proximity to the reported siting, could reasonably believe that their arrest, although ultimately mistaken, was justified.

We hold that Officers Bennis, Kulp, Morris and Moyer are entitled to qualified immunity and accordingly grant summary judgment in their favor on plaintiffs' Section 1983 claim insofar as the claim alleges that the officers violated DeBellis' Fourth Amendment rights when they mistakenly arrested her.[14]

### b. *Excessive Force Claim*

Plaintiffs also allege that defendants used excessive force in arresting DeBellis.[15] Unlike their response to plaintiffs' mistaken identity claim, defendants do not claim the defense of qualified immunity; rather, they attack the substance of plaintiffs' excessive force claim, arguing that defendants did not use excessive force, but used only that force which was reasonably necessary to arrest DeBellis.

▮ A claim for excessive force "should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* at 396, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (quoting *Tennessee v. Garner,* 471 U.S. 1, 8, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)). The Supreme Court has explained that the reasonableness inquiry in an excessive force case is an objective one: "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham* at 397, 105 S.Ct. 3099, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443. The Fourth Amendment reasonableness test "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* The Third Circuit also requires that courts consider "how many individuals the officers confronted and whether 'the physical force applied was of such an extent as to lead to injury.'" *Mellott v. Heemer,* 161 F.3d 117, 122 (3d Cir.1998) (quoting *Sharrar v. Felsing,* 128 F.3d 810, 822 (3d Cir.1997)).

---

**14.** We note that plaintiffs' Section 1983 claim survives insofar as it alleges that DeBellis' Fourth Amendment rights were violated when defendants used excessive force in apprehending her.

**15.** For example, plaintiffs allege that defendants violated DeBellis' Fourth Amendment rights in assaulting and battering DeBellis (Pls.' Compl. at ¶ 96), "[i]n the unreasonable use of force or use of excessive force in the detention, taking into custody and arrest of the minor plaintiff" (Pls.' Compl. at ¶ 96(b)) and "[i]n the unlawful assault and battery of the minor plaintiff." (Pls.' Compl. at ¶ 96(c).)

The Court further stated that the " 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham* at 396, 105 S.Ct. 3099, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443. In making the determination of whether the use of force was reasonable or excessive, the court must allow for the fact that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers violates the Fourth Amendment." *Id.* at 396, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (internal quotations omitted).

■ We find that there are material facts in dispute as to the extent of force Moyer used to arrest DeBellis. For instance, plaintiffs' and defendants' version differ respecting whether DeBellis should have known that she was dealing with a police officer who was trying to take her into custody or whether DeBellis believed that she was being attacked and was going to be raped by a stranger. Plaintiffs state that Moyer showed DeBellis something that looked like a calculator case, but that she had no idea at the time what the object was. Defendants, on the other hand, contend that this object was a police badge, and that Moyer displayed it to DeBellis in order to identify himself as a police officer. Whereas plaintiffs deny that Moyer verbally identified himself, defendants claim that upon approaching DeBellis, Moyer, in addition to displaying his badge, verbally identified himself as a police officer. The resolution of these disputed facts is necessary to determine whether an officer in Moyer's position would have reasonably believed that the juvenile knew that he was a police officer and that he was attempting to take her into custody and not to attack her, that the juvenile was resisting arrest and that the exertion of some force was necessary to accomplish the arrest.[16]

Although both parties admit that there was a struggle between DeBellis and Moyer, they have different versions of the facts underlying that struggle. DeBellis alleges that upon approaching her, Moyer grabbed her arm; when she attempted to free herself from his grasp, he grasped her arm more and more tightly. She states that she then attempted to grab onto a tombstone, in order to avoid being pulled away by Moyer. According to DeBellis, Moyer

---

16. In Pennsylvania, a person who is being arrested generally may not resist the arrest. The legislature has declared that "[t]he use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion," 18 Pa. Cons.Stat. § 505(a), but that "the use of force is not justifiable ... to resist an arrest which the actor knows is being made by a peace officer, although the arrest is unlawful." 18 Pa Cons.Stat. § 505(b)(1)(i). "[A]n arrestee's use of force in self protection is justified [only] when the arrestee reasonably believes that such force is immediately necessary to protect against an arresting officer's use of unlawful and deadly force, i.e., force which is readily capable of causing death or serious bodily injury." *Commonwealth v. French*, 531 Pa. 42, 611 A.2d 175, 179 (Pa.1992).

Here, there is no claim that the officers used deadly force in arresting DeBellis. Nevertheless, based on plaintiffs' versions of the facts, we can conclude that DeBellis could have been justified in using force to resist the arrest. Under § 505, the arrestee must know that she is being arrested by a peace officer; DeBellis has adequately alleged and supported the position that she did not know that Moyer was a police officer.

eventually kicked her feet out from underneath her, such that she spun 180 degrees and landed hard on her back. At that point, he straddled her, pinning her arms and her legs to the grounds so that all she could move was her head. Throughout the encounter, she screamed for him to leave her alone and for someone else to help her. The other officers approached; her back pack was removed and she was handcuffed while still on the ground. They transported her to the police station and shackled her to the floor. Plaintiff asserts that the officers' handling of her bruised her and caused injury to her back, shoulder and neck area. She went to the emergency room following the encounter, and has attended physical therapy sessions and psychological counseling since the incident.

Defendants, on the other hand, contend that when Moyer attempted to take DeBellis into custody, she began to struggle and attempted to escape. They allege that DeBellis was hysterical and tried to kick Moyer, but that Moyer was eventually able to pull DeBellis off balance. DeBellis was thereafter handcuffed and taken to police headquarters where she was shackled to the floor.

The facts alleged by plaintiffs and defendants thus differ as to the degree of force used by both Moyer and DeBellis. Indeed, plaintiffs suggest that Moyer was the one exerting force, and that DeBellis resisted in an attempt to avoid an apparent attacker. Defendants, on the other hand, suggest that DeBellis was the aggressor.[17] Resolution of whether DeBellis affirmatively used force by kicking Moyer, rather than simply attempted to resist his grasp, is necessary to the determination of whether an officer in Moyer's position would have reasonably believed that some

force was necessary to effectuate DeBellis' apprehension. Similarly, resolution of whether Moyer took DeBellis to the ground with such force that she spun 180 degrees or whether he simply pulled her off balance is necessary to the determination of whether the force employed was reasonable or excessive.

Moreover, there has been no showing, as is required by Federal Rule of Civil Procedure 56(c), that defendants are entitled to judgment as a matter of law on the excessive force claim. We recognize that the officers may have believed that they were dealing with a juvenile who posed a potential flight risk and may have been under pressure to make a split-second decision and to take instantaneous action. Nonetheless, viewing the facts in the light most favorable to plaintiffs, we cannot conclude that reasonable officers in defendants' position would have failed to have clearly identified themselves as police officers, would have used the degree of force that plaintiff alleges the officers here used and would have inflicted the severity of injury on a suspect that plaintiff alleges she suffered.

Because we find that there are genuine issues as to material facts and because we cannot conclude that defendants are entitled to judgment as a matter of law on the Section 1983 excessive force claim, we deny defendants' motion for summary judgment on the excessive force claim as to defendant Moyer, who is alleged to have initiated the encounter with plaintiff and to have engaged in the struggle with her prior to her handcuffing.

■ However, we grant summary judgment on the Section 1983 excessive force claim as to defendant Bennis. Plain-

---

**17.** Indeed, Bennis' affidavit states that she "was also persuaded to take [DeBellis] to police headquarters due to what was reported to me by Youth Officer David Moyer as an assault upon him by the juvenile." (C. Bennis Aff. at ¶ 16.)

tiffs' allegations of excessive force primarily concern the manner in which Moyer restrained DeBellis and brought her to the ground. Plaintiffs have not alleged that Bennis was actively involved in restraining DeBellis or that Bennis otherwise exerted unreasonable force against DeBellis. The fact that Bennis had prior knowledge of K.L.'s disappearance, the fact that she requested that Moyer assist her in locating and apprehending K.L. and the fact that she arrived once Moyer had taken DeBellis to the ground are all insufficient to establish that she used excessive force against DeBellis; nor do plaintiffs allege that she directed Moyer to do so.

■ We also grant summary judgment on the Section 1983 excessive force claim as to defendant Morris. Although DeBellis' deposition testimony identifies Morris as the officer who handcuffed her and drove her to police headquarters, nowhere do plaintiffs allege that the manner of handcuffing or his manner of transporting her constituted excessive force. Nor do plaintiffs indicate that Morris otherwise exerted any force against DeBellis.

Likewise, we grant summary judgment on the Section 1983 excessive force claim as to defendant Kulp. Although DeBellis asserts in her affidavit that "[t]he other officers helped the man (officer) on top of

me" (K. DeBellis Aff. at ¶ 20), DeBellis does not otherwise tie Kulp to the acts that allegedly constitute excessive force. This bare assertion is insufficient to establish that Kulp exerted excessive force against DeBellis.

### 5. 42 U.S.C. § 1983: Liability of the City of Allentown

Plaintiffs additionally allege that the city of Allentown is liable under Section 1983.[18]

### a. Mistaken Identity Claim

Plaintiffs allege that the city had a policy or custom which allowed for arrests without probable cause and that it deliberately failed to train its officers in proper identification and arrest techniques.[19]

■ Generally, a municipality cannot be held liable unless one of its employees is "primarily liable under Section 1983 itself." *Williams v. Borough of West Chester*, 891 F.2d 458, 467 (3d Cir.1989); *see also City of Los Angeles v. Heller*, 475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986) (per curium) (holding that a municipality cannot be held liable under the Fourth Amendment if there is no underlying constitutional violation by the individual officer).[20] Having concluded that the

---

**18.** As discussed at IV.A.2, *supra*, defendants' motion as to plaintiffs' Section 1983 claims against the police department is granted. We therefore discuss here the city's liability only.

**19.** For example, plaintiffs allege that defendants violated her Fourth Amendment rights "[i]n developing, implementing, and carrying out a policy, practice, procedure or custom which made no reasonable efforts to comply with standards for arrest ..." (Pls.' Compl. at ¶ 96(i)), in deliberately failing to train, or continue the training of, all the Defendants "in the recognition of ... proper techniques of identification, arrest and detention" (Pls.' Compl. at ¶ 96(n)), and "[i]n failing to properly develop, implement, and carry out a policy,

practice, procedure or custom conforming to the constitutional requirements in arrest and detention to protect individuals, who should be free from subjection to ... unlawful arrest ..." (Pls' Compl. at ¶ 96(p).)

**20.** We note that the Third Circuit has created a limited exception to this general rule. In *Fagan v. City of Vineland*, 22 F.3d 1283 (3d Cir.1994), the court held that in cases in which plaintiffs allege violations of their Fourteenth Amendment substantive due process rights, a municipality can be held independently liable for violating a plaintiff's constitutional rights even if there is no individual liability on the part of the officer. This exception is inapplicable here, where plaintiffs have

individual officers are not liable for their mistaken identity of DeBellis, we hold that the municipality cannot be held liable.

 Moreover, under Section 1983, municipalities do not have *respondeat superior* liability for the acts of their agents. In order to be liable under Section 1983, the municipality itself must have caused the violation. Section 1983 liability attaches to a municipal entity only "when the execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990). In other words, a plaintiff must show that the municipality had an official policy or custom, and that the policy or custom caused the deprivation of a constitutionally protected right.

 A government policy or custom can be established in two ways. Policy is made when a "decisionmaker possess[ing] final authority to establish municipal policy with respect to the action" issues an official proclamation, policy or edict. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); *Andrews* at 1480. A course of conduct is considered to be a "custom" when, though not authorized by law, "such practices of state officials [are] so permanent and well settled as to virtually constitute law." *Monell*, 436 U.S. at 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (internal quotations and citations omitted); *Andrews* at 1480. In either case, a plaintiff must show that a policymaker is responsible either for the

policy or, through acquiescence, for the custom. *Andrews* at 1480.

 *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) expanded the bases for municipal liability to include inadequate police training. To recover under a failure to train theory, the plaintiff must show that: (1) the failure to train amounted to a deliberate indifference to the rights of persons with whom the police come in contact; and (2) the municipality's policy actually caused a constitutional injury. *Id.*, 489 U.S. at 389–90, 392, 109 S.Ct. 1197, 1206, 103 L.Ed.2d 412. For the failure to train to constitute deliberate indifference, the failure must reflect a deliberate or conscious choice made by municipal policymakers. *Id.*, 489 U.S. at 389, 109 S.Ct. 1197, 103 L.Ed.2d 412.

 Here, plaintiffs have not offered any evidence indicating that the city had a policy or custom in place that caused DeBellis to be arrested without adequate cause. Plaintiffs point only to General Order 404.1 of the Allentown Police Policy Manual in arguing that the municipal entities had a policy or custom of making arrests without probable cause. General Order 404.1 cites Pa. Cons.Stat. § 6324, the Pennsylvania statute that authorizes law enforcement officers to, and specifies the grounds on which they may, take children into custody, discussed at IV.A.4.a.ii., *supra*. General Order 404.1 also contains provisions regarding the processing of juveniles who have been taken into custody. Aside from quoting § 6324, which contains the "reasonable grounds" language discussed at IV.A.4.a.ii., *supra*, Order 404.1 does not mention the grounds upon which a juvenile may be brought into custody.

alleged only a violation of the Fourth Amendment and have not alleged a violation of their substantive due process rights.

We conclude that the plaintiffs' reliance on this order is insufficient to establish the existence of a municipal policy or custom that caused the alleged constitutional violations. Plaintiffs' bare allegation that the municipal entities had a policy or custom allowing for arrests to be made based on insufficient cause is inadequate to establish municipal liability.

Nor have plaintiffs offered evidence showing that the city caused DeBellis' injuries by failing to train its officers in deliberate indifference to the constitutional rights of citizens in her position. The bare assertion that defendants failed to provide adequate training and the mere fact that plaintiff is alleged to have suffered constitutional injury do not establish a failure to train amounting to deliberate indifference. Plaintiffs have not shown a pattern of violations. *See generally Berg v. County of Allegheny*, 219 F.3d 261, 276 (3d Cir.2000) (stating that failure to adequately train municipal employees ordinarily can be considered deliberate indifference only where the failure caused a pattern of violations).

We grant summary judgment on plaintiffs' Section 1983 as to the city of Allentown insofar as the claim alleges that defendants violated DeBellis' constitutional rights when they mistakenly arrested her.

### b. *Excessive Force Claim*

Plaintiffs allege that the city and the police department [21] had a policy or custom which allowed for the unreasonable or excessive use of force in detaining, taking into custody and arresting suspects and that they deliberately failed to train their officers as to the proper use of force. [22] Plaintiffs again rely solely on General Order 404.1 in support of their claim of a policy or custom of excessive force. This order does not mention the degree of force that may permissibly be used in making an arrest; plaintiffs' reliance thereupon is therefore insufficient to show the municipality's liability. Plaintiffs have offered no evidence that the city had a policy or custom of using excessive force in making arrests. Plaintiffs' bare assertion that the municipal entity had a policy or custom of using excessive force fails to establish municipal liability.

Nor do plaintiffs offer any evidence that the city failed to train its officers as to the use of force. Their bare assertion that the city failed to provide training does not establish that the entity failed to train, and

---

**21.** As discussed at IV.A.2s, *supra*, defendants' motion as to all of plaintiffs' Section 1983 claims against the police department is granted. We therefore discuss here the city's liability only.

**22.** For example, plaintiffs allege that defendants violated her Fourth Amendment rights in "[i]n the development, implementation, and carrying out of a policy, practice or procedure designed to allow the use of excessive force, ... and/or physical assaults on innocent citizens ..." (Pls.' Compl. at ¶ 96(f)), "[i]n condoning and conducting and failing to restrain an unlawful and unjustified application of force in violation of the constitutional rights of the minor Plaintiff" (Pls.' Compl. at ¶ 96(j)), "[i]n developing, implementing, and carrying out a policy, practice, procedure, or custom which made no reasonable or proper provision for the application of force ..." (Pls.' Compl. at ¶ 96(m)), "[i]n deliberately failing to train, or continue the training of, all the Defendants in the recognition of the proper use of force ..." (Pls.' Compl. at ¶ 96(n)) and "[i]n failing to properly train, supervise, monitor, and control the actions of all the Defendants, so that the proper prior policy, practice, procedure, or custom could be accomplished safely and without the use of excessive force or undue risk to persons similarly situated to the minor Plaintiff in that the Defendants failed to follow training procedures and policy that would have prevented the assault conducted by them on the minor Plaintiff, allowing the Defendants to overact and injure the minor Plaintiff." (Pls' Compl. at ¶ 96(o).)

acted with deliberate indifference in so doing. Plaintiffs have failed to show a pattern of excessive force violations, and the mere fact that plaintiff has alleged to have suffered constitutional injury does not establish municipal liability.

We grant summary judgment on plaintiffs' Section 1983 claim in favor of the city of Allentown insofar as the claim alleges that DeBellis' constitutional rights were violated when the officers used excessive force in arresting her.

### 6. *Supervisory Liability of Chief Held and Mayor Heydt*

 Plaintiffs have also sued Police Chief Held and Allentown Mayor Heydt under Section 1983. "Supervisory liability [under Section 1983] cannot be based solely upon the doctrine of respondeat superior, but there must be affirmative conduct by the supervisor that played a role in the [wrongful conduct.]" *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1478 (3d Cir. 1990) (citing *Rizzo v. Goode*, 423 U.S. 362, 377, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976)). "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence. Allegations of participation or actual knowledge and acquiescence ... must be made with appropriate particularity." *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir.1988). Here, plaintiffs have not alleged that either the Police Chief or the Mayor personally directed the officers to apprehend DeBellis or to use force in so doing; nor have plaintiffs offered any evidence supporting such an allegation. The fact that the Chief and the Mayor are in supervisory positions does not, standing alone, establish their liability. Plaintiffs have also not made any allegations, nor provided any evidence, that the Mayor knew of the alleged wrongdoing and acquiesced.

Plaintiffs' complaint and brief can, however, be read as alleging that the Chief of Police knew of, and acquiesced in, the officers' conduct. Indeed, plaintiffs allege that the Chief performed only a cursory internal investigation into the DeBellis' complaints as to the officers' use of force. However, plaintiffs have offered no evidence on this point to refute defendants' assertion that the Chief is entitled to summary judgment. Plaintiffs' mere assertion, without any supporting evidence, that Chief Held did not properly conduct the investigation is insufficient for them to prevail against defendants' motion for summary judgment.

Having concluded that plaintiffs failed to show that defendants Held and Heydt possessed the requisite involvement to be held liable as supervisors under Section 1983, we grant defendants' motion for summary judgment on plaintiffs' Section 1983 claim as to defendants Held and Heydt.

### B. *Pendant State Claims*

Plaintiffs have also brought claims against the four officers in both their official and individual capacities, Captain Held and Mayor Heydt in both their individual and official capacities, the Allentown Police Department and the city of Allentown for false arrest, false imprisonment, assault and battery, intentional infliction of emotional distress and negligent infliction of emotional distress. Plaintiffs' state law claims are pendant to their federal Section 1983 claim, and are properly before the Court pursuant to our power to exercise supplemental jurisdiction "over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). Defendants seek summary judgment on all of plaintiffs' state law claims, on various grounds.

### 1. State Law Claims Against Allentown Police Department and City of Allentown

■■■ The Pennsylvania Political Subdivision Tort Claims Act, 42 Pa. Cons.Stat. § § 8541–64 grants governmental immunity to political subdivisions against claims for damages on account of any injury to a person or to property except for certain narrow exceptions. Under the Act, local agencies are not liable for injuries caused by their own acts or the acts of their employees that constitute "a crime, actual fraud, malice or willful misconduct," or for negligent acts unless they fall within one of eight categories.[23] 42 Pa. Cons.Stat. § 8542(a). "Local agency" means "a government unit other than the Commonwealth government." 42 Pa. Cons.Stat. § 8501. Both the police department and the city of Allentown are local agencies. Plaintiffs do not allege negligence within any of § 8542's enumerated categories.[24] Therefore, all of plaintiffs' state law claims against the Allentown police department and the city of Allentown are barred, and we will grant summary judgment on the state law claims as to the Allentown police department and the city of Allentown.

### 2. Intentional Tort Claims Against Officers Bennis, Kulp, Morris and Moyer, Chief Held and Mayor Heydt, in their Official Capacities

Because a judgment against defendants in their official capacity would impose liability on the police department and/or city, we grant summary judgment in defendants' favor on plaintiffs' state law claims

brought against defendants Bennis, Kulp, Morris, Moyer, Held and Heydt in their official capacity for the same reasons as discussed at IV.B.1., supra.

### 3. Intentional Tort Claims Against Officers Bennis, Kulp, Morris and Moyer, Chief Held and Mayor Heydt, in their Individual Capacities

Although summary judgment on the claims brought against the officers, the police chief and the mayor in their official capacity will be granted, the state law intentional tort claims brought against them in their individual capacity remain, at least initially.

Under the Pennsylvania Tort Claims Act, with limited exception, employees enjoy the same broad immunity that their employing agencies enjoy. "An employee of a local agency is liable for civil damages on account of any injury to a person or property caused by acts of the employee which are within the scope of his office or duties only to the same extent as his employing local agency ..." 42 Pa. Cons.Stat. § 8545. An employee of a local agency may, in addition, claim the defense of official immunity whereby an employee may assert that his or her conduct "was authorized or required by law, or that [the employee] in good faith reasonably believed the conduct was authorized or required by law." 42 Pa. Cons.Stat. § 8546(2).

However, if the court determines that the employee's act constituted "a crime,

---

**23.** A local agency may be liable for negligent acts within the following categories: (1) vehicle liability, (2) care, custody or control of personal property, (3) real property, (4) trees, traffic controls and street lighting, (5) utility service facilities, (6) streets, (7) sidewalks and (8) care, custody or control of animals. 42 Pa. Cons.Stat. § 8542(b).

**24.** Indeed, plaintiffs allege that defendants committed intentional torts and negligent infliction of emotional distress, the basis for which is not a negligent act within one of the enumerated categories.

actual fraud, actual malice or willful misconduct," the employee's ability to claim both the Act's overall restriction on liability and the defense of official immunity is eliminated.[25] 42 Pa. Cons.Stat. § 8550. The Pennsylvania Supreme Court has decided that at least in the context of police misconduct cases, it is improper to equate willful misconduct with the commission of an intentional tort. Instead, there must be a determination not only that the officer committed the acts in question, but that he willfully went beyond the bounds of the law. *Renk v. City of Pittsburgh,* 537 Pa. 68, 641 A.2d 289 (Pa.1994). Therefore, an officer may be liable for false imprisonment and false arrest only if it is found both that there was no probable cause to make the arrest and that the officer knew that there was no probable cause, and for assault and battery if it is shown not just that he acted intentionally, but also that the officer knew that the force used was not reasonable under the circumstances. *See id.,* 641 A.2d at 293–94.

We will discuss each of the state law claims separately. Before doing so, we address the liability of Police Chief Held and Mayor Heydt on all of the state intentional tort claims.

### a. *Liability of Police Chief Held and Mayor Heydt*

■ As noted discussed above, employees of local agencies enjoy the same degree of immunity from civil liability as do the agencies, so long as the employees have not engaged in criminal, fraudulent or malicious conduct, or in willful misconduct. The misconduct that plaintiffs allege does not fall within one of the eight enumerated negligence exceptions that would impose liability on the agencies themselves. Additionally, plaintiffs have not defeated defendants' claim for immunity by showing that Held and Heydt engaged in willful misconduct. As discussed at IV. A.6., *supra,* plaintiffs have not shown that Held and Heydt were actively involved in the apprehension of DeBellis. Held and Heydt did not order that she be arrested, were not present when she was arrested and did not direct that the officers use force in taking her into custody. Given that Held and Heydt lacked any direct involvement with her arrest, as a matter of logic, their involvement cannot constitute willful misconduct.

Plaintiffs' complaint and brief might be read as arguing separately that Chief Held acquiesced in the officers' conduct when he concluded in the department's internal investigation that the officers did not use excessive force. However, plaintiffs have offered no evidence to show that the investigation was improperly conducted such that a jury could possibly find that he engaged in willful misconduct. Therefore, we conclude that plaintiffs have failed to offer any evidence from which a jury could find that Held and Heydt engaged in willful misconduct. Accordingly, Held and Heydt are immune from civil liability on the state law claims and we grant summary judgment in their favor on all of the state law claims. The following discussion of plaintiffs' state law claims thus addresses the liability of Officers Bennis, Kulp, Morris and Moyer.

### b. *False Arrest Claim*

■ In Pennsylvania, a "false arrest is defined as 1) an arrest made without probable cause or 2) an arrest made by a person without privilege to do so." *McGriff v. Vidovich,* 699 A.2d 797, 799

---

**25.** We note that the local agency itself does not lose its immunity from liability when an employee commits an act of willful misconduct. *Wakshul v. City of Philadelphia,* 998 F.Supp. 585, 588 (E.D.Pa.1998).

(Pa.Cmwlth.1997). Plaintiffs allege that DeBellis was arrested without probable cause. The Pennsylvania and federal standards regarding the existence of probable cause are the same. *See Renk v. City of Pittsburgh*, 537 Pa. 68, 641 A.2d 289, 293 (Pa.1994).

We concluded in IV.A.4.a.ii., *supra*, that plaintiffs' allegations, even if true, and the facts, taken in the light most favorable to plaintiffs, do not show that the officers arrested DeBellis without cause. Thus, defendants are entitled to immunity on this claim. We therefore grant defendants' motion for summary judgment on the state law false arrest claim as to defendants Bennis, Kulp, Morris and Moyer.[26]

### c. *False Imprisonment Claim*

In Pennsylvania, "the elements of false imprisonment are (1) the detention of another person, and (2) the unlawfulness of such detention." *Renk*, 641 A.2d at 293. An arrest is lawful if it is based upon probable cause. *Id.*

We concluded at IV.A.4.a.ii., *supra*, that plaintiffs' allegations, even if true, and the facts, taken in the light most favorable to plaintiffs, do not show that the officers arrested DeBellis without cause. Thus, defendants are immune. We therefore grant defendants' motion for summary judgment on the state law false imprisonment claim as to defendants Bennis, Kulp, Morris and Moyer.[27]

### d. *Assault and Battery Claim*

In Pennsylvania, an assault occurs when an actor intends to cause imminent apprehension of harm or offensive contact to another. *Paves v. Corson*, 765 A.2d 1128 (2000). A battery is a harmful or offensive contact with the person of another. *Id.* In making an arrest, a police officer "is justified in the use of any force which he believes to be necessary to effect the arrest and of any force which he believes to be necessary to defend himself or another from bodily harm while making the arrest." 18 Pa. Cons.Stat. § 508; *see also Renk*, 641 A.2d at 293. *Renk* notes that

> a police officer may use reasonable force to prevent interference with the exercise of his authority or the performance of his duty. In making a lawful arrest, a police officer may use such force as is reasonably necessary under the circumstances to effectuate the arrest. The reasonableness of force used in making the arrest determines whether the police officer's conduct constitutes an assault and battery.

*Renk*, 641 A.2d at 293.

However, as noted at IV.A.4.b., *supra*, plaintiffs do not allege facts or offer evidence from which a jury could find that Bennis, Kulp or Morris committed assault and battery; nor do they allege facts from which a jury could find that they engaged in willful misconduct. Accordingly, Bennis, Kulp and Morris can claim the protection of governmental immunity and the

---

**26.** We note that even if Bennis and Moyer were found to have arrested DeBellis without cause and to have engaged in willful misconduct such that they would not be allowed to claim immunity, Kulp and Morris lacked significant involvement and cannot be said to have engaged in willful misconduct. Thus, even if Bennis and Moyer were liable, Kulp and Morris would nevertheless be entitled to immunity.

**27.** We note that even if Bennis and Moyer were found to have arrested DeBellis without cause and to have engaged in willful misconduct such that they would not be allowed to claim immunity, Kulp and Morris lacked significant involvement and cannot be said to have engaged in willful misconduct. Thus, even if Bennis and Moyer were liable, Kulp and Morris would nevertheless be entitled to immunity.

defense of official immunity. Therefore, we find that Officers Bennis, Kulp and Morris have governmental and official immunity for their conduct and grant summary their favor on plaintiffs' state law assault and battery claims against them.

However, as noted at IV.A.4.b., *supra,* there are disputed facts which preclude us from determining whether Officer Moyer's use of force was reasonable. Plaintiffs have also alleged sufficient facts from which a jury could determine that Officer Moyer knew that the force he used was unreasonable under the circumstances,[28] which would remove his restriction on liability and his official immunity defense. Therefore, we will deny Officer Moyer's request for summary judgment on plaintiffs' state law assault and battery claims.

e. *Intentional Infliction of Emotional Distress Claim*

 To recover for intentional infliction of emotional distress in Pennsylvania, a plaintiff must support the claim of emotional distress with competent medical evidence, in the form of expert medical evidence. *Hackney v. Woodring,* 539 Pa. 266, 652 A.2d 291, 292 (1994) (per curium); *Kazatsky v. King David Memorial Park,* 515 Pa. 183, 527 A.2d 988, 995 (1987); *see also Campbell v. Speare,* No. CIV.93–3233, 1995 WL 143117, at *4 (E.D.Pa. March 30, 1995); *Neal v. Baker,* No. CIV.A. 93–6658, 1995 WL 136988, at *4 (E.D.Pa. March 30, 1995). Because plaintiffs have not offered any medical evidence to support their intentional infliction of emotional distress claim, we grant summary judgment on this claim in favor of Officers Bennis, Kulp, Morris and Moyer.

4. *Negligent Infliction of Emotional Distress Claim*

Plaintiffs' negligent infliction of emotional distress claim does not fall within any of the specified categories where sovereign immunity has been waived.[29] *See, e.g., Frazier v. Southeastern Pennsylvania Transp. Auth.,* 868 F.Supp. 757, 762 (E.D.Pa.1994); *Moser v. Bascelli,* 865 F.Supp. 249, 253 (E.D.Pa.1994). We grant summary judgment on the negligent infliction of emotional distress claim as to all of the defendants.

C. *Punitive Damages*

1. *Claim for Punitive Damages Under 42 U.S.C. § 1983*

a. *Claim for Punitive Damages against Allentown Police Department and City of Allentown*

 Municipal entities are immune from punitive damages under Section 1983. *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981). Thus, even if the police department and the city were not entitled to summary judgment on the Section 1983 claims, such damages would not be available against them. We grant summary judgment in favor of the Allentown Police Department and the city of Allentown on plaintiffs' claim for punitive damages.

b. *Claim for Punitive Damages against Officers Bennis, Kulp, Morris and Moyer, Chief Held and Mayor Heydt, in their Official Capacities*

 Punitive damages are also not available under Section 1983 against local

---

**28.** We note that Pennsylvania's official immunity standard differs from Section 1983's qualified immunity standard. Pennsylvania's official immunity standard is a subjective test while Section 1983's standard is an objective test.

**29.** As discussed at IV.B.1 and IV.B.3, *supra,* political subdivisions, as well as their employees, enjoy immunity from liability for negligent acts that do not fall within certain specified categories.

officials in their official capacity. *Leipziger v. Township of Falls*, No. CIV.A. 00–1147, 2001 WL 111611, at *9 (E.D.Pa. Feb. 1, 2001). Thus, even if summary judgment were not granted as to plaintiffs' claims against the defendants in their official capacity, such damages would not be available against them in their official capacity. Therefore, we grant summary judgment in favor of defendants Bennis, Kulp, Morris, Moyer, Held and Heydt on plaintiffs' claim for punitive damages against them in their official capacity.

c. *Claim for Punitive Damages Against Officers Bennis, Kulp, Morris and Moyer, Chief Held and Mayor Heydt in their Individual Capacities*

Although punitive damages are not available against the municipal entities and against the defendants in their official capacity, plaintiffs may seek punitive damages against defendants in their individual capacity. "In order to obtain such damages, plaintiff must establish facts of record that prove that the individuals knowingly and maliciously deprived plaintiffs of their civil rights." *Ruiz v. Philadelphia Hous. Auth.*, No. CIV.A. 96–7853, 1998 WL 159038, at *10 (E.D.Pa. March 17, 1998). The Third Circuit has stated that

for a plaintiff in a § 1983 case to qualify for a punitive award, the defendant's conduct must be, at a minimum, reckless or callous. Punitive damages might also be allowed if the conduct is intentional or motivated by evil motive, but the defendant's action need not necessarily meet this higher standard.

*Savarese v. Agriss*, 883 F.2d 1194, 1204 (3d Cir.1989) (citing *Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983)).

Having already concluded at IV.A.4.b and IV.A.6, *supra*, that defendants Bennis,

Kulp, Morris, Held and Heydt lacked any significant involvement in DeBellis' arrest, we find that a jury could not find their conduct to be reckless or callous. Therefore, we grant summary judgment in Bennis', Kulp's, Morris', Held's and Heydt's favor on plaintiffs' claim under Section 1983 for punitive damages against them.

We have found that plaintiffs have alleged sufficient facts, and have offered adequate supporting evidence, from which a jury could find that Officer Moyer used excessive force in arresting DeBellis. Should the jury find that Officer Moyer violated DeBellis' Fourth Amendment rights when he arrested her, a jury could justifiably find that he acted recklessly or callously. Accordingly, we deny defendants' motion for summary judgment on plaintiffs' claim for punitive damages under Section 1983 against Moyer.

2. *Claim for Punitive Damages Under State Law*

■ The Supreme Court of Pennsylvania has adopted the Restatement (Second) of Torts, § 908(2), which permits damages for "conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." *Rizzo v. Haines*, 520 Pa. 484, 555 A.2d 58, 69 (Pa.1989) (quoting Rest. (2d) Torts § 908(2)). The proper focus is on "the act itself together with all the circumstances including motive of the wrongdoer and the relations between the parties ..." *Id.* (citing *Chambers v. Montgomery*, 411 Pa. 339, 192 A.2d 355, 358 (1963)). Further, a court may award punitive damages only if the conduct was malicious, wanton, reckless, willful, or oppressive. *Id.* (citing *Chambers*, 411 Pa. 339, 192 A.2d at 358).

Defendants Allentown Police Department and City of Allentown, as well as all of the defendants in their official capacity, have immunity on all of the state law

claims. Plaintiffs therefore cannot claim punitive damages against the municipal entities under state law. Similarly, in IV. B.3.a, IV.B.3.b., IV.B.3.c. and IV.B.3.d, *supra*, we found that Officers Bennis, Kulp and Morris, Chief Held and Mayor Heydt lacked sufficient involvement to have engaged in willful misconduct and were immune from civil liability on all of the state law claims. Accordingly, there is no evidence that they acted maliciously or recklessly so as to justify a claim for punitive damages against them. We grant defendants' motion for summary judgment as to the punitive damages claim under state law against defendants Bennis, Kulp, Morris, Held and Heydt.

Punitive damages may be available against Officer Moyer, however. Plaintiffs must prove substantially similar states of mind of Officer Moyer to overcome the hurdle of immunity and to recover punitive damages. Therefore, any claims that we have found must go to the jury on the merits should also be considered for punitive damages. Although we concluded that Officer Moyer is immune from civil liability as to the claims for false arrest and false imprisonment,[30] we decided that a jury could find that Moyer committed assault and battery, and that he engaged in willful misconduct in doing so. Therefore, the jury may consider whether punitive damages are appropriate for the state law assault and battery claims against him, and we will deny Moyer's motion for summary judgment as to punitive damages on these claims.

### D. *Rule 17*

Defendants also object to the fact that Karisa DeBellis' parents, Nicolas W. DeBellis and Patricia DeBellis, have brought this action instead of Karisa DeBellis herself. They argue that her parents lack the capacity to bring this action since, at the time of the commencement of the lawsuit, Karisa DeBellis was over eighteen years of age and had full capacity to bring the matter on her own behalf; they assert that under Rule 17 of the Federal Rules of Civil Procedure, Karisa DeBellis is the real party in interest. They similarly argue that her parents lack standing to bring the suit.

 Federal Rule of Civil Procedure 17 provides in part that "[e]very action shall be prosecuted in the name of the real party in interest." Fed.R.Civ.P. 17(a). According to Rule 17, "[t]he capacity of an individual, other than one acting in a representative capacity, to sue or be sued shall be determined by the law of the individual's domicile." Fed.R.Civ.P. 17(b); *see also Kedra v. City of Philadelphia*, 454 F.Supp. 652, 661 n. 4 (E.D.Pa.1978). Under Pennsylvania law, a "minor" is defined as "an individual under the age of eighteen years." Pa.R.C.P. No. 76. Although Karisa DeBellis was seventeen at the time of her arrest, there is no dispute that she was over eighteen years of age when this action was commenced. Therefore, Karisa DeBellis, and not her parents, is the real party in interest, and the action should be brought on her own behalf.

However, the fact that her parents and not Karisa DeBellis herself brought the action is not grounds for dismissal. Indeed, Rule 17 provides that

> [n]o action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest;

---

**30.** We also concluded that the intentional infliction of emotional distress claim should be dismissed, but on grounds other than official immunity.

and such ratification, joinder, or substitution shall have the same effect as if the action had been commenced in the name of the real party in interest.

Fed.R.Civ.P. 17(b).

We will allow plaintiffs to amend their complaint, so as to name Karisa DeBellis as the real party in interest. Such amendment will resolve defendants' Rule 17 and standing concerns.

### E. Entry of Partial Final Judgment

Federal Rule of Civil Procedure 56(d) provides that if summary judgment is not rendered "upon the whole case or for all the relief asked and a trial is necessary," the court shall, if practicable, ascertain what facts exist without substantial controversy. An alternative to this provision is to certify for appeal those claims as to which final judgment is entered.

■■ In a suit that involves multiple parties or in which more than one claim for relief is presented, a district court "may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties," but the court may only do so "upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment." Fed.R.Civ.P. 54(b). The court must exercise its discretion in entering final judgment under this rule "in the interest of sound judicial administration." Sears, Roebuck & Co. v. Mackey, 351 U.S. 427, 437, 76 S.Ct. 895, 100 L.Ed. 1297 (1956).

■■ In order to enter partial final judgment, the court must first determine that it is "dealing with a final judgment." Curtiss–Wright Corp. v. General Electric Co., 446 U.S. 1, 7, 100 S.Ct. 1460, 64 L.Ed.2d 1 (1980). It must be a "judgment" in the sense that it is a decision upon a cognizable claim for relief, and it must be "final" in the sense that it is an

"ultimate disposition of an individual claim entered in the course of a multiple claims action." Id.

Next, the court must determine whether there is any reason for delaying entry of final judgment. The court must balance the interests of "sound judicial administration" and the equities involved, i.e., justice to the litigants. Curtiss–Wright, 446 U.S. at 2, 100 S.Ct. 1460, 64 L.Ed.2d 1; see also Carter v. City of Philadelphia, 181 F.3d 339, 346 (3d Cir.1999); Waldorf v. Shuta, 142 F.3d 601, 608 (3d Cir.1998). As the Third Circuit has stated, "[t]he rule attempts to strike a balance between the undesirability of piecemeal appeals and the need for making review available at a time that best serves the needs of the parties." Allis–Chalmers· Corp. v. Philadelphia Elec. Co., 521 F.2d 360, 363 (3d Cir.1975).

■■ In determining whether there are "just reasons for delay," the court should consider "whether the claims under review [are] separable from the others remaining to be adjudicated and whether the nature of the claims already determined [is] such that no appellate court would have to decide the same issues more than once even if there were subsequent appeals." Carter, 181 F.3d at 346 (quoting Curtiss–Wright, 446 U.S. at 7, 100 S.Ct. 1460, 64 L.Ed.2d 1). The Carter court noted that "some factual overlap between the issues in [the] appeal and those in a potential future appeal" is permissible, because "[i]t is generally recognized that complete legal or factual distinction is not necessary to 54(b) certification." Id. at 346 & n. 20 (citing 10 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure, § 2657 at 50–54).

■■ Applying these principles to the facts of this case, we enter final judgment under Federal Rule of Civil Procedure 54(b) on all claims against the Allentown

Police Department, against the city of Allentown, and against Officers Bennis, Kulp and Morris, Captain Held and Mayor Heydt. This decision is a "judgment" in the sense that it is a decision upon various cognizable claims brought by plaintiffs for relief. It is "final" in the sense that is an ultimate disposition of the aforementioned claims. We find that there is no just reason for delaying the entry of judgment with respect to the claims against these defendants. These claims are separable from the claims that remain for adjudication against Officer Moyer. Indeed, the claims against the Allentown Police Department, the city of Allentown, Officers Bennis, Kulp and Morris, Captain Held and Mayor Heydt upon which we will enter final judgment are brought against defendants that we have found lacked any significant involvement with the only actionable conduct in this case: the degree of force Moyer applied in apprehending DeBellis. Therefore, we find that the entry of judgment upon the aforementioned claims to be in the interest of sound judicial administration.

An appropriate order follows.

## ORDER

AND NOW, this 10th day of September, 2001, upon consideration of Defendants' Motion for Summary Judgment, Defendants' Brief in Support of Motion for Summary Judgment and attachments thereto, filed on July 30, 2001; Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment and attachments thereto, filed on August 15, 2001; it is hereby ORDERED, consistent with the foregoing Opinion, that plaintiffs' motion is granted in part and denied in part as follows:

1. Partial summary judgment is GRANTED in favor of the City of Allentown with respect to all claims.

2. Partial summary judgment is GRANTED in favor of the Allentown Police Department with respect to all claims.

3. Partial summary judgment is GRANTED in favor of Patrol Officer Charles Kulp, Patrol Officer Keith Morris, Youth Officer Carol Bennis, Captain Carl W. Held and Mayor William L. Heydt on all claims brought against them in their official and individual capacities.

4. Partial summary judgment is GRANTED in favor Youth Officer David Moyer on all claims brought against him in his official capacity and these claims are DISMISSED WITH PREJUDICE as to him.

5. Partial summary judgment is GRANTED in favor of Youth Officer David Moyer with respect to plaintiffs' Section 1983 claim brought against him in his individual capacity insofar as plaintiffs allege that Youth Officer David Moyer violated Karisa DeBellis' rights under the Fourth Amendment to the United States Constitution when he mistakenly identified and arrested her.

6. Partial summary judgment is GRANTED in favor of Youth Officer David Moyer with respect to plaintiffs' state law claims for false arrest, false imprisonment, intentional infliction of emotional distress and negligent infliction of emotional distress.

7. Summary judgment is DENIED in all other respects. (This means in particular that the Section 1983 claim of excessive force and the state law claims of assault and battery against Youth Officer David Moyer will proceed to trial.)

8. Plaintiffs shall amend the caption of the complaint within fourteen days

of the date of this order to show that Karisa DeBellis is the real party in interest.